UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
:
ESTHER MAYSONET,                                            :
                                                            :
                              Plaintiff,                    :
                                                            :      03 Civ. 5223 (GEL)
           -v-                                              :
                                                            :      **OPINION AND ORDER**
TOMMY G. THOMPSON,                                          :
                                                            :
                              Defendant.                    :
                                                            :
------------------------------------------------------------x

Alan E. Wolin, Wolin & Wolin Esqs., Jericho, NY,
for Plaintiff.

Heidi Ann Wendel, Assistant United States Attorney
(David N. Kelley, United States Attorney for the
Southern District of New York, of counsel), New York,
NY, for Defendant.

GERARD E. LYNCH, District Judge:

  Esther Maysonet, a woman of Puerto Rican background, who works as a criminal investigator in the Office of the Inspector General ("OIG"), Department of Health and Human Services ("HHS"), brings this employment discrimination lawsuit, arguing that she was unfairly terminated based on sex and national origin, and that after being reinstated by the United States Merit Systems Protection Board ("Merit Board"), she was retaliated against and subjected to a hostile working environment. The Government moves for leave to amend its answer and for summary judgment. The motion to amend will be granted, and the motion for summary judgment will be granted in part and denied in part.

# BACKGROUND

The following facts are not in dispute, except where indicated. Maysonet began a one-year probationary period of employment as a criminal investigator for OIG in September 1999. In August 2000, she was informed by her supervisor that she was being fired for unsatisfactory performance.

Maysonet promptly appealed her dismissal to the Merit Board, arguing that she was fired because of her sex and national origin, and because of her obligations as a member of the Marine Corps Reserves, which required her presence for active duty or training during certain periods of the year. After a hearing, the Merit Board Administrative Law Judge ("ALJ") agreed that her "military obligation was a motivating or substantial factor in the agency's decision to remove her during her probationary period," and that "but for her two weeks of active duty military training in August 2000, she would not have been removed from service." (Declaration of Pamela J. Langer, dated December 15, 2004 ("Langer Decl."), Ex. A at 16, 34.) The ALJ ordered Maysonet's reinstatement, with back pay and benefits. Maysonet was reinstated on September 10, 2001, and her employment has continued ever since.

The ALJ's order did not fix the amount of back pay and other relief to which Maysonet was entitled. That question was negotiated between Maysonet and the Government, ultimately resulting in a settlement agreement in June 2004. The settlement agreement provided that Maysonet would receive several retroactive promotions in pay grade, and commensurate back pay. The agreement provided that it constituted "full and complete settlement of all claims regarding Ms. Maysonet's pay level since her reinstatement in September 2000," and that Maysonet "waive[d] her right to file in other forums any challenges involving her pay level from

the date of her reinstatement to the present." (Langer Decl., Ex. F at 1.)

In February 2001, while her Merit Board appeal was pending, Maysonet also filed an EEO complaint alleging that her firing was based on sex and national origin. Among other things, she alleged that her then supervisor, Special Agent Jaysen Eisengrein, was excessively critical of her work, editing reports filed by her and another female agent with more corrections than those imposed on a male investigator, Tom Floersch. According to her initial EEO complaint, "[s]imilarly situated male and non-Puerto Rican employees were not treated in this fashion." (Langer Decl., Ex. G at 2.) Specifically, she charged that Floersch was freely granted military leave, while she had to go through "embarrassing steps" to take hers. (Langer Decl., Ex. I at 3-4.) The complaint also alleged that she was "treated as if [she] kn[ew] nothing," and that Eisengrein "seemed to have problems with females and Hispanics," and had told her she was "not the right kind of people" for OIG, and that he appreciated her "trying to be an American" by serving in the Marines. (Langer Decl., Ex. G at 2; see also Maysonet Dep., Declaration of Heidi A. Wendel, dated December 16, 2004, Ex. B ("Dep."), at 67-71.)

In February 2002, Maysonet amended her EEO complaint to charge that since being reinstated, her supervisor and others had retaliated against her for filing her Merit Board appeal and EEO complaint. The amended complaint referred to a number of occasions on which she felt intimidated or belittled by comments made or actions taken by her supervisors, and described various incidents where she was reprimanded or given inferior assignments, placed in an office that would allow her to be observed by supervisors, denied a government credit card, and denied training for extra duty assignments that was provided to other agents. (Langer Decl., Ex. J.) At her deposition in this action, however, Maysonet agreed that she has not suffered any

discrimination since returning from a military leave on June 11, 2004. (Dep. at 223-24.)

After investigating Maysonet's EEO complaint, HHS issued a final decision finding no discrimination. On July 16, 2003, Maysonet timely filed this action, making substantially the same allegations as in her EEO complaint. In this action, she again challenges her initial termination, and seeks a further advancement in pay, arguing that had she not been fired, she would now be paid at a higher level. She also seeks compensation for emotional distress resulting from her firing and the alleged retaliation and hostile work environment she has suffered since that time.

## DISCUSSION

I. Legal Standards

   A. Summary Judgment

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c)). In turn, a "genuine issue as to any material fact" is established "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "It is the movant's burden to show that no genuine factual dispute exists, and all reasonable inferences must be drawn in the non-movant's favor." Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) (internal citations omitted); see United States v. Diebold, Inc., 369 U.S. 654, 655 (1962). A summary judgment motion will be defeated with respect to those claims that present such genuine issues of material fact.

To defeat summary judgment, however, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "[C]onclusory allegations or unsubstantiated speculation" will not suffice. Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998). Rather, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 587.

B. Title VII Standards

1. Disparate Treatment and Retaliation Claims

In deciding a summary judgment motion with respect to Title VII disparate treatment and retaliation claims, the Court applies the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Terry v. Ashcroft, 336 F.3d 128, 140-41 (2d Cir. 2003). The first question is whether the plaintiff has established the "minimal" prima facie case of discrimination or retaliation. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993); Fisher v. Vassar College, 114 F.3d 1332, 1333-35 (2d Cir. 1997) (en banc); see also Quinn v. Green Tree Credit Corp., 159 F.3d 759, 764 (2d Cir. 1998); Gallagher v. Delaney, 139 F.3d 338, 349 (2d Cir. 1998). To make out a prima facie case of disparate treatment, a plaintiff has the initial burden of showing (1) that she belonged to a protected class; (2) that she was qualified for the position at issue; (3) that she suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent. See Terry, 336 F.3d at 137-38; Collins v. New York City Transit Auth., 305 F.3d 113, 118 (2d Cir. 2002). "To establish a prima facie case of retaliation, an employee must show [1] participation in a protected activity known to the defendant; [2] an employment action

5

disadvantaging the plaintiff; and [3] a casual connection between the protected activity and the adverse employment action." Terry, 336 F.3d at 141 (internal citations, quotation marks, and emphasis omitted); Manoharan v. Columbia Univ. College of Physicians & Surgeons, 842 F.2d 590, 593 (2d Cir. 1988). "Title VII is violated when a 'retaliatory motive plays a part in adverse employment actions toward an employee, whether or not it was the sole cause.' " Terry, 336 F.3d at 140-41 (quoting Cosgrove v. Sears, Robuck & Co., 9 F.3d 1033, 1039 (2d Cir. 1993)).

As to either disparate treatment or retaliation claims, if the plaintiff has established her prima facie case, a presumption of discrimination or retaliation is established which "places the burden of production on the employer to proffer a nondiscriminatory [or non-retaliatory] reason for its action." James v. New York Racing Assoc., 233 F.3d 149, 154 (2d Cir. 2000). If the employer fails to present such a reason, plaintiff prevails. But, if "the employer can rebut that presumption by offering legitimate, non-retaliatory [or non-discriminatory] reasons for the contested actions; if it succeeds, the burden reverts to the plaintiff to demonstrate that those reasons are merely pretextual." Myrick v. New York City Employees Ret. Sys., 99 Civ. 4308, 2002 WL 868469, at *5 (S.D.N.Y. May 3, 2002) (citing St. Mary's Honor Ctr., 509 U.S. at 506-507; James, 233 F.3d at 154; Fisher, 114 F.3d at 1333-35). If the plaintiff cannot then proffer evidence showing that the reasons for termination were in fact pretextual, "an employer acting for legitimate, non-retaliatory [or non-discriminatory] reasons will be entitled to summary judgment." Id.

An employer acting for legitimate, non-retaliatory, non-discriminatory reasons will be entitled to summary judgment, "unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination" or retaliation. James, 233 F.3d at 154 (citations

omitted); see also Gallagher, 139 F.3d at 349-50. Evidence casting doubt on the employer's proffered justification "may – or may not – be sufficient" to provide this support. Fisher, 114 F.3d at 1333. Thus, when the employer has proffered an explanation and the plaintiff has attempted to refute it, the Court's responsibility is to "examin[e] the entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated [or retaliated] against the plaintiff.' " Schnabel v. Abramson, 232 F.3d 83, 90 (2d Cir. 2000) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000)).

      2.     Hostile Work Environment Claim

In order to withstand summary judgment on a hostile environment claim under Title VII, plaintiff must establish that (1) she was subjected to harassment based on a prohibited ground of discrimination; (2) the harassment was so severe as to alter the terms and conditions of her employment, and (3) there is a basis for imputing the harassing conduct to the employer. Distasio v. Perkin Elmer Corp., 157 F.3d 55, 62 (2d Cir. 1998). To meet the severity requirement, plaintiff must establish that the harassment was severe or pervasive enough to create an objectively hostile environment, and that she subjectively perceived the environment to be abusive. Alfano v. Costello, 294 F.3d 365, 373-74 (2d Cir. 2002). In general, "incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive," and "[i]solated acts, unless very serious, do not meet the threshold of severity or pervasiveness." Id. at 374. In determining whether allegations of abusive conduct are sufficient to meet the threshold for an objectively hostile environment, courts examine the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is

physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Systems, Inc., 510 U.S. 17, 23 (1993). "While the standard for establishing a hostile work environment is high, [the Second Circuit has] repeatedly cautioned against setting the bar too high, noting that while a mild, isolated incident does not make a work environment hostile, the test is whether the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse." Terry, 336 F.3d at 148 (internal citations, quotation marks, and alteration omitted).

"[A]n employer is liable for the discriminatorily abusive work environment created by a supervisor if the supervisor uses his actual or apparent authority to further the harassment, or if he was otherwise aided in accomplishing the harassment by the existence of the agency relationship." Karibian v. Columbia Univ., 14 F.3d 773, 780 (2d Cir. 1994). An employer who has notice that an employee is being harassed – notice is presumed where a supervisor is responsible for the harassment – has a duty to take reasonable steps to eliminate the harassment. Distasio, 157 F.3d at 62; Murray v. New York Univ. Coll. of Dentistry, 57 F.3d 243, 249 (2d Cir. 1995). The employer may avoid liability, however, by establishing that it took reasonable steps to remedy the problem, and that the harassed employee unreasonably failed to avail herself of the corrective measures provided by the employer. Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998); Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998).

II.     The Legal Standards Applied

Applying these familiar standards to the facts of this case has been made difficult by the failure of plaintiff's counsel to provide useful argumentation. In addressing a summary judgment motion in an employment discrimination case, this judge usually begins by reading the plaintiff's brief. The issue on summary judgment is essentially whether the plaintiff has enough evidence of discrimination to warrant a jury trial, and it is helpful to examine, without the distortion of an opposing argument, the plaintiff's presentation of the evidence, which presumably provides the most positive possible spin on the record.

In this case, however, plaintiff's counsel is entirely derelict in addressing the record. Plaintiff's 13-page brief in opposition to the motion consists almost entirely of boilerplate recitation of the legal standards discussed above – correctly and professionally stated – virtually without reference to the particular facts of this case. Although it is entirely appropriate to present this material, such a recitation is likely to be of little use to an experienced federal judge, who is already familiar with the applicable legal standards from dozens of similar cases in this well-tread area of the law. What is required and helpful is an explanation of how the evidence in the present case would raise a genuine issue of fact regarding the claim of discrimination, and would permit a reasonable jury to find that the defendant's conduct was unlawful.

Plaintiff's brief contains at most two paragraphs that relate to the merits of her case. In one passage, plaintiff argues that she "was the victim of several remarks which she attributed to her national origin," and that she "was not given the same support, was unfairly criticized, was treated differently with respect to her military orders and was treated differently with respect to requiring a doctor's note." (P. Br. 9.) These generalized assertions are not supported by any

9

citation or reference to evidence, and there is no attempt to explain why a jury could find that any adverse treatment was attributable to plaintiff's national origin.  In a later passage, plaintiff simply refers generally to her "56.1 Statement" (a reference to the statement of facts required by this Court's Local Rule 56.1) as containing "incidents of reprisal which can qualify as adverse employment actions."  (Id. 12.)  Once again, there is no reference whatsoever to the actual record evidence in the case, or even an indication of which of the episodes recounted in the Rule 56.1 Statement plaintiff claims suffice to constitute adverse employment actions.

Left to rummage in the Rule 56.1 Statement to develop the arguments that plaintiff's counsel failed to make, the Court discovers that this statement too is inadequate.  Most of the propositions of fact in the statement are unsupported by citations to the record, but instead cite to the complaint.  Plaintiff's opposition is not supported by an affidavit or other declaration, and fails to reference testimony in plaintiff's deposition.  In short, the Court is left entirely on its own to look through those portions of the record that the *defendant* has provided in support of its motion, in hopes of finding any evidence favoring plaintiff's position.

The Court deserves better of members of the bar practicing before it.  More importantly, the plaintiff deserves better of an attorney who has undertaken to represent her.  If the plaintiff's case is totally lacking in merit, such that a responsible lawyer cannot present a non-frivolous argument against summary judgment, the lawyer should advise the client to withdraw the action, and himself withdraw from representation if she refuses.  If the record will support a reasonable argument that a genuine issue of fact is presented, then the attorney is ethically obliged to represent his client zealously by making that argument as persuasively as possible.  Putting in a nominal opposition that does nothing to defend the plaintiff's position is not an option.

A. <u>Discrimination</u>

1. <u>Promotion and Back Pay</u>

While this action has been pending, Maysonet entered a settlement agreement with the Government, growing out of the Merit Board proceeding that resulted in her reinstatement. That agreement was negotiated with the assistance of the Merit Board ALJ, and signed by Maysonet, a college-educated criminal investigator who was represented by counsel at the time. The agreement provides for retroactive promotions and concomitant back pay, and expressly waives any further claims for such relief. (Langer Decl. at ¶ 7 & Ex. F; Dep. 215.)

The Government moves to amend its answer to assert a defense based on this new development. Plaintiff does not oppose the amendment. (P. Br. 1 n.1.) Although plaintiff does not expressly withdraw the claims that the Government contends are barred by the settlement, she makes no response or reference to the Government's argument that the settlement bars her claims for further promotion or back pay. Accordingly, Maysonet is deemed to have conceded this issue. See, e.g., <u>Jessamy v. City of New Rochelle</u>, 292 F. Supp. 2d 498, 504-05 (S.D.N.Y. 2003). In any event, the Government is plainly correct on this point. The settlement agreement expressly waives any further claim in any forum for additional pay or promotion as a consequence of her termination, and plaintiff does not assert that the agreement was entered unknowingly or involuntarily. See <u>Fletcher v. Potter</u>, No. 02 Civ. 9385 (GWG), 2004 WL 1167378, at *5 (S.D.N.Y. May 26, 2004), quoting <u>Bormann v. AT&T Communications, Inc.</u>, 875 F.2d 399, 403 (2d Cir. 1989).

2. <u>Termination</u>

Although plaintiff has given up any claim for back pay as a result of the settlement of her Merit Board case, she has not waived or released any claim for other damages resulting from her firing, and continues to press the claim that she was wrongfully fired by reason of sex and national origin. While it is unclear what actual damages can be proved, apart from the now-resolved claims for promotions and back pay, the claim of discriminatory firing remains alive. The Government seeks summary judgment, arguing that Maysonet has not presented a genuine issue of fact with respect to whether her firing was based on national origin and/or sex. "Summary judgment must be entered 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" <u>Reeves v. Johnson Controls World Servs., Inc.</u>, 140 F.3d 144, 149 (2d Cir. 1998), quoting <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). Here, however, plaintiff has presented evidence that would permit a reasonable jury to find in her favor.

Plaintiff meets the "minimal" burden of establishing a prima facie case. <u>St. Mary's Honor Ctr.</u>, 509 U.S. at 506; <u>Fisher</u>, 114 F.3d at 1333-35. As noted above, many of the factual assertions in plaintiff's Rule 56.1 statement are unsupported by admissible evidence, referencing plaintiff's complaint or to nothing at all. "[A] party opposing a properly supported motion for summary judgment is not entitled to rely solely on the allegations of her pleading, but must show that there is admissible evidence sufficient to support a finding in her favor on the issue that is the basis for the motion." <u>Fitzgerald v. Henderson</u>, 251 F.3d 345, 360-61 (2d Cir. 2001). But Maysonet's deposition contains testimony that, if credited by the jury, would permit a finding that she has made out her prima face case.

First, plaintiff is a woman of Puerto Rican background and therefore a member of protected classes with reference to claims of sex- and national-origin-based discrimination. Second, it is undisputed that she was qualified to work for defendant; she was hired because she met the basic prerequisites for the job, and she has worked successfully since being reinstated. Third, she was terminated, the ultimate adverse employment action. The fourth factor of Maysonet's prima facie case – whether she was fired under circumstances giving rise to an inference of discrimination – poses a closer call. But when the evidence is viewed in the light most favorable to Maysonet, <u>Dawson v. Bumble & Bumble</u>, 398 F.3d 211, 216 (2005), the circumstances surrounding her employment raise the inference that her termination was motivated by discrimination.

Maysonet testified to instances in which she was allegedly treated differently from non-Hispanic and/or male fellow investigators. She testified, for example, that she was once required to show her military orders prior to taking leave, while Floersch (a white male in her unit who started work after Maysonet and was also under the supervision of Eisengrein) was not, and that she was required to supply a doctor's note prior to taking sick leave, while Floersch was not. (Dep. 300-15.) She also alleges that her written work was edited more closely than that of her coworkers – specifically that she modeled a report after that of Omar Perez (a Hispanic male investigator), but had hers returned to her marked up, whereas Perez's was accepted without any revisions. (Langer Decl., Ex. I at 3-4.) Maysonet more generally claims that "[d]efendant and his agents generally did not provide plaintiff with the support during her probationary period which was given to male and non-Hispanic employees" including Floersch and Leslie Payne (a white female investigator that started at the same time as Maysonet, but reported to a different

13

supervisor). (Pl. 56.1 Stmt. ¶¶ 21, 22; Langler Decl, Ex. I at 3-4.) Maysonet claims that Eisengrein treated poorly and disrespected female agents, spoke condescendingly towards them, and that some female agents felt uncomfortable with him. (Pl. 56.1 Stmt. ¶ 66; Dep. 71-78.)

In addition, Maysonet quotes comments by Eisengrein that could be understood by a reasonable jury as discriminatory references to her national origin or sex, such as statements that "we are a different breed here," that she was not "the right kind of people" for the job, and that he appreciated her "trying to be an American" by serving in the Marines. (Dep. 67-71.) A jury could certainly reject the inference that these remarks were indicative of bias. Indeed, Maysonet's own shifting testimony helps to undermine that inference. At her deposition in this action, Maysonet suggested that she understood the "different breed" comment to be discriminatory as to her sex and national origin. (Dep. 67-70; 115-18.) However, at her deposition in the Merit Board proceedings, Maysonet suggested she herself understood the "different breed" comments to refer to Eisengrein's belief that federal law enforcement officers were superior to the state officers Maysonet had previously worked with. (Langer Decl. Ex. B at 57). In the same deposition, Maysonet testified that the "trying to be an American" remark referred to her need to take military leave. (Langer Decl. Ex. B at 94-95). But this is not inconsistent with interpreting the mark to reflect bias. While the context for the remark, and the source of Eisengrein's annoyance, may have been Maysonet's need to attend reserve training, a jury could well find that by referring to Maysonet's membership in the Marines not as a natural expression of patriotism, but as "*trying to be* an American," Eisengrein was implying that as a person of Hispanic heritage, Maysonet (who was born in American) was not fully American but had to undertake efforts to become so. According to Maysonet, Eisengrein repeated the

"different breed" comment several times, but her testimony is unclear as to whether Eisengrein repeated either of the other two comments more than once. (Dep. 67-70, 115-16.) Maysonet also testified that Eisengrein "doesn't show that he respects me or likes me as a professional." (Id. at 66.) A jury would not be required to agree with Maysonet's reading of these remarks, but it could, and if it did those remarks would further support a finding of discrimination.

At the Merit Board hearing, Maysonet testified that she attributed her dismissal not to gender or ethnic bias, but to her absence to fulfill her military obligations:

> Q. Do you believe that your dismissal was motivated y your military status and military obligations?
>
> A. Yes
>
> Q. Do you believe that you would not have been dismissed, but for that status and that obligation?
>
> A. Yes.

(Langer Decl., Ex. C at 139.) But this testimony alone does not preclude a discrimination claim: what counts is what motivated the dismissal, not what Maysonet believes, and the dismissal could have been the product of multiple reasons. A jury might well discredit this testimony as based on Maysonet's desire at the time to establish a claim of discrimination due to military service in order to prevail at the Merit Board hearing, where indeed she received reversal of her firing and eventually full satisfaction of her back pay and promotion claims.

In sum, although the individual weight of any one of the above-listed incidents or comments is weak, taken together they raise a question as to whether her firing was based on her sex or national origin, and thus meet the "minimal" showing required to avoid summary judgment. Although a jury could discredit Maysonet in view of her own shifting account of the

15

reasons behind her dismissal, it would not be required to do so.

Once the plaintiff establishes her prima facie case, the burden shifts to the defendant to proffer a legitimate non-discriminatory reason for its termination of the plaintiff. Here, defendant raises no such legitimate non-discriminatory reason, but rests on the argument that Maysonet has presented insufficient evidence to suggests she was discriminated against on the basis of her sex or national origin. Moreover, even if the Government did put forth a legitimate non-discriminatory reason in support of plaintiff's termination (or argued that she was fired because of her military obligations, which would be impermissible for other reasons, but which would be inconsistent with the claim of sex or national origin discrimination), there remains an issue of fact with regard to whether that reason is pretextual, in light of evidence permitting an inference that the real reason was her gender or national origin.

Accordingly, summary judgment is denied on plaintiff's termination claim.

B. Retaliation

As described above, in order to establish a claim for retaliation under the employment discrimination laws, a plaintiff must prove that she has suffered an "adverse employment action." To be considered an "adverse employment action," an employer's action must effect a " 'materially adverse change' in the terms and conditions of employment." Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000). Such an action need not rise to the level of firing or reduced wages, but "not every unpleasant matter . . . creates a cause of action." Wanamaker v. Columbian Rope Co., 108 F.3d 462, 466 (2d Cir. 1997) (internal citation and quotation marks omitted).

Since being reinstated, Maysonet has been continuously employed by HHS, and has suffered no reduction in pay or benefits or responsibility. Indeed, at her deposition, Maysonet acknowledged that she was treated fairly with respect to these and other various matters. (Dep. 153-59, 226-31, 242-45.) The matters of which she complains, to the extent they are supported by evidence, do not rise to the level of adverse employment actions, and in any event are not plausibly linked to her complaints of discrimination, or even, in some cases, to her.

For example, Maysonet alleges that at a meeting shortly after she returned to work in September 2001, a supervisor "strongly emphasized that all his Agents are to follow instructions/orders from their Supervisors and if he finds out that an Agent disrespects or disobeys the Supervisor, they will be fired." (Langer Decl., Ex. J at 2-3.) Maysonet claims these remarks were intended for her, and that she felt intimidated by them. (Id.) Putting aside the fact that there was nothing improper about the remark on its face, and that there is little admissible evidence indicating that the remark was directed toward Maysonet in particular (see Dep. 19-27; plaintiff's assertion that others told her they believed the remarks were directed at her, Dep. 25-32, constitute inadmissible hearsay), remarks that make an employee feel "frightened" or "intimidated" do not constitute an adverse employment action unless the employee suffered a material adverse change in the terms and conditions of employment. Torres v. Pisano, 116 F.3d 625, 639-40 (2d Cir. 1997). Maysonet provides no evidence, or even allegation, that this single remark affected her ability to do her job, or otherwise rose to the level of an adverse change.

Similarly, Maysonet claims that on an occasion in November or December 2001, she was given an inferior assignment during a search. The claim is far from adequate to constitute retaliation. Once again, the connection to Maysonet's complaint is tenuous; indeed, except for

17

the relative proximity to her return to work after being reinstated, there is no evidence of a connection at all, and Maysonet admitted that she was only assigned to the project in the first place because she happened to be working late when the agents assigned to the case "need[ed] an extra body to assist in the search warrant." (Langer Decl., Ex. J at 5.) But even if there were such a connection, being relegated to a supporting role on one evening's operation does not constitute an adverse employment action.

Maysonet's other claims of poor treatment after her return are similarly lacking. Complaints about difficulties obtaining parking spaces or a government credit card do not come close to a material adverse change in working conditions. Moreover, each of these complaints evaporates on close inspection: being directed to the building manager to work out the parking issue is hardly inappropriate, given that Maysonet herself testified that the building manager could provide parking spaces (Dep. 47-55), and the credit card decision was made by the credit card issuer, not by the Government, although it was based on an outstanding balance on a government credit card for work-related travel (Dep. 179-80, 292-94). Individually or collectively, the various minor incidents recited in Maysonet's Rule 56.1 statement do not amount to adverse employment action. For such incidents to constitute adverse employment action, a plaintiff must show that "using an objective standard, . . . the total circumstances of [her] working environment changed to become unreasonably inferior and adverse when compared to a typical or normal, not ideal or model, workplace. . . . Incidents that are relatively minor and infrequent will not meet the standard . . . ." Phillips v. Bowen, 278 F.3d 103, 109 (2d Cir. 2002). No reasonable jury could find that Maysonet's collection of complaints, which closely resemble the sort of list that any disgruntled employee could compile in any "typical or

normal" workplace, meets that standard.

   C. Hostile Work Environment

For essentially the same reasons, Maysonet's claim of hostile work environment also fails. The incidents on which Maysonet relies do not remotely meet the standard of a workplace "permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the [plaintiff's] employment and create an abusive working environment.'" Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993), quoting Meritor Savings Bank v. Vinson, 477 U.S. 57, 59 (1986). Maysonet repeatedly admitted that she was treated fairly and without discrimination in the major material elements of her working environment. (Dep. 153-59, 226-31, 242-45.) Plaintiff's brief makes not the slightest attempt to explain how the trivial incidents asserted by the Maysonet could be found by a jury to meet the standard. (P. Br. 12-13.)

## CONCLUSION

For the reasons stated above, the Government's motions to amend its answer is granted, and its motion for summary judgment is granted with respect to plaintiff's claims of retaliation, and hostile work environment, and denied with respect to her claim of discriminatory firing, except to the extent that any claim for promotion or back pay is dismissed.

SO ORDERED.

Dated: New York, New York
    April 21, 2005

                                    _____
                                    GERARD E. LYNCH
                                    United States District Judge